# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**WANDA GILLIN,**

        **Plaintiff,**

        **v.**                        **Case No. 17-CV-1295**

**NANCY A. BERRYHILL,**

        **Defendant.**

## DECISION AND ORDER

### PROCEDURAL HISTORY

Plaintiff Wanda Gillin alleges she has been disabled since March 1, 2012, due to back and neck pain, asthma, and arthritis in her hands. (Tr. 80, 128.) In October 2013 she applied for disability insurance benefits. (Tr. 214-15.) After her application was denied initially (Tr. 127-38) and upon reconsideration (Tr. 139-53), a hearing was held before an administrative law judge (ALJ) on June 6, 2016 (Tr. 76-126). On July 19, 2016, the ALJ issued a written decision concluding Gillin was not disabled. (Tr. 18-30.) The Appeals Council denied Gillin's request for review on July 27, 2017. (Tr. 1-4.) This action followed. All parties consented to the full jurisdiction of a magistrate judge (*see* ECF Nos. 4, 6, 7), and the matter is now ready for resolution.

## ALJ'S DECISION

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity. The ALJ found that Gillin "did not engage in substantial gainful activity during the period from her amended alleged onset date of March 1, 2012 through her date last insured of September 30, 2015." (Tr. 23.)

The analysis then proceeds to the second step, which considers whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). "In order for an impairment to be considered severe at this step of the process, the impairment must significantly limit an individual's ability to perform basic work activities." *Moore v. Colvin*, 743 F.3d 118, 1121 (7th Cir. 2014). The ALJ concluded that, through the date last insured, Gillin had the following severe impairments: "degenerative disc disease of the cervical and lumbar spine, chronic obstructive pulmonary disease (COPD), asthma, and obesity." (Tr. 23.)

At step three, the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 4, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 416.1526, 416.920(d) and 416.926) (called, "The Listings.") If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve month duration requirement, 20 C.F.R. § 416.909, the claimant is disabled. If the

claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. The ALJ found that Gillin "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments" through the date last insured. (Tr. 24.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the claimant's ability to perform both physical and mental work-related activities on a regular and continuing basis despite her impairments. *Moore*, 743 F.3d at 1121. In making the RFC finding, the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. §§ 404.1529, 416.929, SSR 96-4p. In other words, the RFC determination is a "function by function" assessment of the claimant's maximum work capability. *Elder v. Asture*, 529 F.3d 408, 412 (7th Cir. 2008). The ALJ concluded that, through the date last insured, Gillin had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except she is limited to frequent handling and fingering with the upper extremities; she is limited to occasional climbing of ramps or stairs, and occasional balancing, stooping, or crouching; she is limited to no climbing of ladders, ropes, or scaffolds; she must avoid exposure to unprotected heights, moving mechanical parts, and extreme heat or cold; she must avoid concentrated exposure to dust, odors, fumes, pulmonary irritants; and she requires the use of a cane for ambulation and balance.

(Tr. 24.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1526, 416.965. Gillin's past relevant work was as a fast food manager and fast food worker. (Tr. 28.) The ALJ concluded that Gillin was unable to perform any past relevant work. (*Id.*)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. At this step the ALJ concluded that, considering Gillin's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Gillin can perform. (Tr. 29.) In reaching that conclusion the ALJ relied on testimony from a vocational expert, who testified that a hypothetical individual of Gillin's age, education, work experience, and RFC could perform the requirements of office helper and hostess. (*Id.*) Finding that Gillin could perform work in the national economy, the ALJ concluded that she was not disabled. (Tr. 30.)

## STANDARD OF REVIEW

The court's role in reviewing an ALJ's decision is limited. It does not look at the evidence anew and make an independent determination as to whether the claimant is disabled. Rather, the court must affirm the ALJ's decision if it is supported by substantial evidence. *Moore*, 743 F.3d at 1120. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. at

1120-21 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Thus, it is possible that opposing conclusions both can be supported by substantial evidence. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).

It is not the Court's role to reweigh evidence or substitute its judgment for that of the ALJ. *Moore*, 743 F.3d at 1121. Rather, the court must determine whether the ALJ complied with his obligation to build an "accurate and logical bridge" between the evidence and his conclusion that is sufficient to enable a court to review the administrative findings. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014); *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). "This deference is lessened, however, where the ALJ's findings rest on an error of fact or logic." *Thomas*, 745 F.3d at 806. If the ALJ committed a material error of law the court cannot affirm the ALJ's decision regardless of whether it is supported by substantial evidence. *Beardsley*, 758 F.3d at 837; *Farrell v. Astrue*, 692 F.3d 767, 770 (7th Cir. 2012).

## ANALYSIS

Although it's not clear, it appears that Gillin contends that (1) the ALJ erred at steps two and three of the sequential evaluation process, (2) the ALJ's RFC determination was not supported by substantial evidence, and (3) the ALJ erred in his step-five findings. (ECF No. 14.)

## I. Step-Two Finding

Gillin appears to argue that the ALJ erred at step two of the sequential evaluation process by failing to find Gillin's history of headaches to be a severe impairment. (ECF 14 at 11-12.) The ALJ found "no evidence of any recent treatment for migraine headaches," and concluded "[t]he migraines are nonsevere." (Tr. 24.)

A severe impairment is an impairment or combination of impairments that "significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c). An impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28.

Gillin's medical records show that she met with a neurologist for her headaches in October 2011, nearly six months before her amended onset date. (Tr. 554-55.) The neurologist increased the dosage of topiramate (Topamax) Gillin was taking and noted "if topiramate does not work, amitriptyline will be tried." (Tr. 555.) This is the last record of Gillin receiving any treatment for headaches.

Gillin complained to nurse practitioner Katie Larson of chronic headaches from February 2012 through June 2013, but Larson never increased the dosage of Topamax or prescribed any other treatment. (508-39.) After October 30, 2013, Topamax is notably absent from the list of medications Gillin was taking. (*See, e.g.*, Tr. 780, 805, 813, 828-29, 839.) At the hearing before the ALJ on June 6, 2016, Gillin testified that she was not

currently taking any medication to help with her headaches because she does not "want to take any more medication." (Tr. 118.)

The court finds substantial evidence in the record supports the ALJ's finding that Gillin's headaches are nonsevere.

## II. Step-Three Findings

### A. Ability to Ambulate Effectively

At step three, the ALJ found that "[t]he degenerative disc disease of the cervical and lumbar spine do not meet the requirements of section 1.04 as there is no evidence of nerve root or spinal cord compromise and the claimant is able to ambulate effectively." (Tr. 24.) Section 1.04 of the listings generally addresses disorders of the spine resulting in compromise of a nerve root or the spinal cord. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04. Section 1.04C requires, "Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b."*Id.* at § 1.04C.

Gillin disputes the ALJ's conclusion that she can ambulate effectively. Specifically, Gillin alleges that her use of a cane, need for a walker, antalgic gait, and inability to get on an examination table establish her inability to ambulate effectively. (ECF No. 14 at 12.) Although it's not clear, it appears that Gillin may be arguing that her

inability to ambulate effectively required a finding that she met or equaled section 1.04C of the listings.[1]

The "inability to ambulate effectively" is defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B2b(1). Examples of ineffective ambulation

> include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00B2b(2). "To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." *Id.*

Gillin reported to Dr. James Bartlett that she uses a walker (which she said "was prescribed by a pain management team and she believes it was a nurse" (Tr. 785)) without which she would fall. (Tr. 784-85.) Dr. Bartlett noted in his report that Gillin was able to walk around the examination room without a walker. (Tr. 784.) Gillin testified that she uses the walker to help her get out of bed in the morning and when

---

[1] In her reply brief, Gillin argues for the first time that the ALJ erred by not evaluating Section 1.04A of the listings. (ECF No. 19 at 6-7.) Gillin's failure to raise this argument in her initial brief means that she has waived it. *Griffin v. Bell*, 694 F.3d 817, 822 (7th Cir. 2012)("arguments raised for the first time in a reply brief are deemed waived").

she is getting out of the shower. (Tr. 99.) Beyond that, it is not clear how much she uses the walker.

Gillin's medical records contain numerous examinations at which Gillin was found to have had a normal gait. (*See e.g.*, Tr. 781, 797, 802, 806, 810, 814, 820, 823, 826.) A March 2014 medical record noted that Gillin was using a treadmill in her basement three times a week. (Tr. 567.)

Substantial evidence in the record supports the ALJ's conclusion that Gillin's ambulation problems were not so severe as to meet or medically equal the criteria set forth in section 1.04C of the listings.

B. **Asthma**

Also at step three the ALJ found that

> [Gillin's] asthma does not meet the requirements of section 3.03 of the listings as there is no evidence of chronic asthmatic bronchitis and no evidence of attacks in spite of prescribed treatment and requiring physician intervention occurring at least once every two months or six times a year (attacks requiring in-patient hospitalization for more than 24 hours count as two attacks).

(Tr. 24.) Gillin cites to a three-day hospitalization in 2013, a number of emergency room visits for asthma exacerbations, referrals to an asthma clinic for evaluation, and "numerous other examples of treatment for asthma, including a seven day hospitalization in April 2016." (ECF No. 14 at 12-14.) Although she states that the ALJ "failed to properly evaluate the medical evidence of asthma" (ECF No. 14 at 12), it is not

clear whether Gillin is arguing that her asthma meets or medically equals the requirements set forth in section 3.03 of the listings.

Section 3.03, which addresses asthma, discusses chronic asthmatic bronchitis (3.03A) and both the nature and frequency of pulmonary attacks (3.03B). At the time of the ALJ's opinion, section 3.03B required

> [a]ttacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.03B. Attacks of asthma are defined as "prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.00C.

Evidence in the record shows that Gillin received intensive treatment for asthma attacks in a hospital, emergency room, or equivalent setting on three occasions in a twelve consecutive month period: May 18, 2013 (Tr. 448-51), May 30, 2013 (Tr. 442-45), and July 22, 2013 through July 25, 2013 (Tr. 417-25). Since her hospitalization from July 22 through July 25 was longer than twenty-four hours, it counts as two attacks. In all, that totals four total attacks in the twelve-month period. Her seven-day hospitalization in 2016 is outside the twelve consecutive month period used to determine the frequency

of attacks and after her date last insured. Therefore, to the extent Gillin is arguing that the ALJ erred in finding that her asthma did not meet the requirements of section 3.03 of the listings, the court finds that substantial evidence supports his finding.

### III. RFC Assessment

#### A. Gillin's Subjective Symptoms

Gillin argues that in his RFC assessment the ALJ erred by "minimiz[ing] the extent of her back and neck pain and overstat[ing] the efficacy of the treatment she received." (ECF No. 14 at 14.) The ALJ concluded that Gillin's statements regarding the intensity, persistence, and limiting effects of her neck and back pain were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 25-27.)

Pursuant to SSR 16-3p, the ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3, at *2, *see also* 20 C.F.R. 416.929. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work related activities…." SSR 16-3p, at *2.

The court reviews an ALJ's credibility finding deferentially, reversing only if it is "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017). The critical question is whether the ALJ provided reasons based on the record before him to support his conclusion. *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004). An ALJ is not required to "specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012); *see also Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) (noting that an ALJ need only "minimally articulate reasons for crediting or rejecting evidence of disability").

The ALJ found that Gillin's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 25.) However, he concluded that Gillin's statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*) In reaching that conclusion, the ALJ stated that "the treatment [Gillin] has received for cervical pain has been conservative and at least somewhat successful as evidenced by the fact that neither steroid injections nor surgery has been required." (Tr. 26.)

The Commissioner concedes that Gillin's treatment included steroid injections for her cervical pain. (ECF No. 14 at 14; ECF No. 18 at 21.) The record shows Gillin received cervical steroid injections on November 7, 2013, and then again on November 18, 2013. (Tr. 690, 703.) The record also shows Gillin's pain level after the cervical steroid

injections did not change from her pain level before the injections. (Tr. 678, 684, 687, 698, 701, 718, 724.) The Commissioner argues that the ALJ's "misstatement" regarding whether Gillin's treatment included cervical steroid injections does not undermine his well-reasoned decision. The court disagrees.

The ALJ's conclusion that Gillin's statements regarding her neck pain were not consistent with the medical record was based at least in part on his finding that she only received "conservative treatment" and had "benefitted from treatment for her neck[.]" (Tr. 25-26.) It is unclear whether the ALJ would have reached the same conclusion about Gillin's testimony had he been clear on whether her treatment included cervical steroid injections. Remand is necessary to clarify this aspect of the ALJ's decision.

## B. Other Limiting Impairments

Gillin argues that the ALJ erred by failing to include in his RFC determination limitations for absenteeism, headaches, seriously infected abscesses, and mental impairments, which Gillin alleges had an impact on her ability to work. (ECF No. 14 at 8, 15-16.) "In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009)(citing SSR 96-8p; *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003)).

Gillin contends that the ALJ failed to adequately account for her absenteeism in determining her RFC. (ECF No. 14 at 8.) Gillin received medical treatment on about 118 days from her alleged onset date to the date last insured. Katie Larson, a family nurse-practitioner (NP), and Dr. Adnam Nazir estimated that she likely would be absent from work more than four days per month. The ALJ did not address Gillin's absenteeism in his RFC determination or in his hypotheticals to the vocational expert. The court finds that the failure to do so was error warranting remand.

Gillan also argues that the ALJ failed to properly evaluate in his RFC determination limitations resulting from her headaches. Although the ALJ found her headaches to be nonsevere, his RFC determination must still account for functional limitations from nonsevere impairments. *Villano* 556 F.3d at 563. At the June 2016 hearing, Gillin testified that she gets a headache every other day where she has to go lay down because it's difficult to concentrate. (Tr. 118.) Nurse Practitioner Larson and Dr. Nazir listed headaches as a precipitating factor of Gillin's pain. (Tr. 859.) Dr. Pat Chan, a state agency consultant whose opinion the ALJ gave great weight, also noted that Gillin suffered from chronic headaches. (Tr. 136.) The court finds the ALJ erred by failing to address Gillin's headaches in his RFC determination.

Gillin next argues that the ALJ failed to properly evaluate limitations resulting from two incidents of seriously infected abscesses. (ECF No. 14 at 15.) The only limitation Gillin alleges related to the infected abscesses is that she was susceptible to

"infections and allergies" due to a significantly elevated IgE level. (*Id.*) Gillin does not set forth any medical evidence of an actual infection or any allergic reaction. The court finds that the ALJ did not err in failing to include in his RFC determination any limitations resulting from infected abscesses.

Gillin further argues that the ALJ failed to properly evaluate "whether Gillin's mental impairments had an impact on her ability to work." (*Id.*) Gillin underwent psychological counseling on one occasion in October 2013 (Tr. 498), and Gillin self-reported her depression and anxiety as "moderate" (Tr. 507). Further, at the June 2016 hearing the ALJ asked Gillin, "Do you believe you have any mental health conditions that would affect your ability to work?" Gillin responded, "It's just stress." (Tr. 108.) The court finds that the ALJ did not err by failing to include in his RFC determination any limitations resulting from any alleged mental impairments.

## C. Medical Opinion Evidence

### 1. *Treating Source Opinion*

According to the ALJ's decision, "NP Larson completed a physical RFC questionnaire indicating she had been treating [Gillin] since 2010 for chronic back and lower extremity pain, COPD, and osteoarthritis." (Tr. 28.) Larson's opinion was not entitled to controlling weight because a nurse practitioner is not a "treating source" under the regulations. *See* 20 C.F.R. § 416.902 ("Treating source means [a claimant's] physician, psychologist, or other acceptable medical source …."); *id.* § 416.913(d)(1)

(listing nurse-practitioner among occupations that are not "acceptable medical sources"); *Turner v. Astrue*, 390 Fed. App'x 581, 586 (7th Cir. 2010). The ALJ gave Larson's opinion less weight than that accorded a treating source. (Tr. 28.)

However, the ALJ did not acknowledge that Dr. Nazir also signed the physical RFC questionnaire authored by Larson. Dr. Nazir has examined and treated Gillin for a number of years (ECF No. 14 at 26) and is considered a "treating source" under the regulations. *See* 20 C.F.R. § 416.902. The ALJ's decision makes no reference to Dr. Nazir.

"Under 20 C.F.R. § 404.1527(c)(2), a treating source's opinion should receive controlling weight if it is well supported by medically acceptable clinical techniques and not inconsistent with other substantial evidence in the record." *Stepp v. Colvin*, 795 F.3d 711, 719 (7th Cir. 2015). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)(citing 20 C.F.R. § 404.1527(c)(2)).

Because the ALJ did not recognize the physical RFC questionnaire as Dr. Nazir's opinion, he did not give the opinion controlling weight or evaluate the opinion taking into account the factors in 20 C.F.R. § 404.1527 to decide how much weight to give Dr. Nazir's opinion. Remand is necessary so he can do so.

### 2. *Dr. Chan's Opinion*

Gillin argues that the ALJ erred by giving "great weight" to the opinion of Dr. Chan, a state agency reviewing physician, but not adopting all of Dr. Chan's opinions in the RFC determination. (ECF No. 14 at 27.) Specifically, Gillin points out that Dr. Chan said Gillin "could tolerate no exposure to fumes, dusts, gases, etc." But the ALJ only limited Gillin to "avoid[ing] concentrated exposure to dust, odors, fumes, pulmonary irritants…." (ECF No. 14 at 27; *see also* Tr. 24.)

The court finds that the ALJ did not err by not adopting all of Dr. Chan's opinions in his RFC determination. Dr. Chan wrote that Gillin must avoid "even moderate exposure" of fumes, odors, dusts, gases, poor ventilation, etc., not *all or any* exposure as Gillin contends. (Tr. 135.) Even if the ALJ erred in his RFC determination and should have adopted Dr. Chan's opinion limiting Gillin to "avoid even moderate exposure" to these elements, any error was harmless in light of the vocational expert's testimony that a hypothetical individual with Gillin's RFC could perform the jobs of office helper and hostess (Tr. 29, 122), neither of which requires any exposure to fumes, odors, dusts, gases or poor ventilation. *See* Dictionary of Occupational Titles 239.567-010, 349,667-014. *See Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) ("[W]e will not remand a case for further specification when we are convinced that the ALJ will reach the same result.").

### *3. Dr. Bartlett's Opinion*

Gillin further argues that the ALJ erred by "cherry-pick[ing] portions of Dr. Bartlett's examination report." (ECF No. 14 at 17.) The ALJ gave the opinion of Dr. Bartlett, an examining physician, "little weight" because he found Dr. Bartlett's findings "appear[ed] to be based on claimant's statements regarding her abilities rather than his independent medical judgment." (Tr. 28.) Gillin contends the ALJ's conclusion regarding Dr. Bartlett's opinion was wrong on the facts and made with unsupported inferences. (ECF No. 14 at 17.)

Dr. Bartlett's disability report makes very few objective examination findings and relies heavily on Gillin's own statements regarding her abilities, noted throughout the report. (*See* Tr. 783-85.) Further, it is clear that the ALJ did, in fact, consider the limited objective examination findings made by Dr. Bartlett. (*See* Tr. 26.) The court finds that the ALJ's decision to give little weight to Dr. Bartlett's opinion is supported by substantial evidence in the record as a whole.

### IV. Step-Five Findings

Finally, Gillin argues that the ALJ erred by failing to resolve conflicts between the vocational expert's testimony and the Dictionary of Occupational Titles (DOT). (ECF No. 14 at 28-30.) Social Security Ruling 00-4p "requires ALJs to investigate and resolve any apparent conflict between the VE's testimony and the DOT." *Weatherbee v. Astrue*,

649 F.3d 565, 570 (7th Cir. 2011). Gillin claims the ALJ failed to resolve apparent conflicts between the vocational expert's claim that a hypothetical person with Gillin's impairments could perform work as an office helper and a hostess and the DOT entries for those jobs.

The vocational expert identified office helper and hostess as *examples* of positions which the hypothetical individual could perform:

> **Q Okay, and can the hypothetical individual perform any other work in the National Economy?**
> **A Oh, sure.**
> **Q Okay.**
> **A Examples would be Office Helper, light, unskilled level; 233,000 people do that work. A representative example is DOT #239.567-010. Such an individual could perform work as a Hostess. 225,000 people do that work. DOT number is 349.667-014.**

(Tr. 122.) In providing the DOT number, the vocational expert gave representative examples of the more broad categories of "office helper" and "hostess." *See Weatherbee v. Astrue*, 649 F.3d 565, 571 (7th Cir. 2011) ("When read in the context of the VE's adjacent testimony, it is clear that the VE's discussion of 'office clerk jobs' was meant to refer to a broad category of jobs that the DOT describes as clerical, not to the single occupation listed in Section 209.562-010 of the DOT."). The ALJ acknowledged as much. (Tr. 29 (referring to the jobs listed as "representative occupations").)

Moreover, the fact that there may be some duties under the DOT entry for "office helper" that Gillin could not perform does not establish a conflict between the DOT and

the vocational expert's testimony. *See Weatherbee*, 649 F.3d at 572 ("The fact that there are a large number of production jobs that are beyond the capabilities of sedentary, non-skilled laborers is not, on its own, sufficient to establish an apparent conflict between the VE's testimony and the DOT. The fifth step in the disability analysis framework focuses only on the types of work that the claimant can perform, not the positions the claimant is precluded from working.").

Because there was no apparent conflict with the vocational expert's testimony, the ALJ did not err by relying on her opinion.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and this matter is **remanded** for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 7th day of August, 2018.

WILLIAM E. DUFFIN
U.S. Magistrate Judge